UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JESSICA A. TWARDOWSKI | § § | |
| Plaintiff, | § § | Civil Action No. 1:20-cv-04285-MFW |
| v. | § § | **BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| CREDIT MANAGEMENT, LP | § § | |
| Defendant. | § § | |

## DEFENDANT CREDIT MANAGEMENT, LP'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant/Movant, Credit Management, LP ("CMLP" or "Defendant"), and in support of its Motion for Summary Judgment, states as follows:

### INTRODUCTION

The facts, here, are straightforward. In brief, this case arises from an attempt to collect a debt by CMLP on behalf of Walgreens. Jessica Twardowski ("Plaintiff") owed a debt to Walgreens that was discharged in bankruptcy (the "Account"). Soon after her bankruptcy became final and the discharge order was entered, Credit Management, LP ("CMLP"), a debt collection agency, received the Account from Walgreens for purposes of collection. Neither Walgreens, nor the Plaintiff, nor the Bankruptcy Court, nor a third-party bankruptcy scrub service, nor any other party notified CMLP of the bankruptcy or bankruptcy discharge prior to its collection activity. Despite CMLP's multi-pronged and automated procedures designed to identify accounts that are subject to bankruptcy and automatically cease collections, CMLP remained unaware of Plaintiff's bankruptcy and sent one collection letter to Plaintiff.

1

CMLP sent Plaintiff a letter on July 1, 2020, in an attempt to inform her of the debt and her rights to validate and dispute it. Plaintiff gave the letter to her lawyers, who were already retained for unrelated reasons. On July 21, 2020, her lawyers, rather than dispute the debt or otherwise attempt to inform CMLP of the bankruptcy, filed this lawsuit, seeking damages under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*. (the "FDCPA"). CMLP, for the first time, became aware of Plaintiff's bankruptcy with the filing of this suit. Once notified of the bankruptcy, per its policy prohibiting collection on accounts subject to bankruptcy, CMLP immediately shut down the Account and ceased all collection activity.

The undisputed facts demonstrate that CMLP is entitled to summary judgment in this case for two reasons. First, Plaintiff cannot prove she suffered an injury-in-fact to support Article III standing. Plaintiff testified that she knew that the debt was discharged and therefore uncollectable at the time she read the letter. She therefore experienced no injury other than the loss of energy required from the opening of the envelope. Further, Plaintiff has admitted at deposition that any stress, anxiety, or emotional distress she may have been experiencing at the time she received CMLP's letter stemmed from sources other than the letter. She took no action other than hand the letter to her previously-retained lawyers, was not at all worried she would have to pay or that the debt was not discharged, and failed to even mention the letter or CMLP to her psychiatrist. Not only does her description of alleged injuries fall short of the Article III threshold, but if she was experiencing any stress or anxiety, she admits those feelings are not fairly-traceable to any alleged actions of CMLP.

Second, CMLP is protected from liability by the bona fide error defense. 15 U.S.C. § 1692k(c). The undisputed facts in this case prove CMLP engages in multiple automated and company-wide procedures to identify accounts subject to bankruptcy, and then, as a policy,

immediately and automatically ceases collection on such accounts. At the time of account placement, CMLP subjects all new accounts to a comprehensive third-party bankruptcy scrub, and closes any accounts it finds are subject to bankruptcy through this scrub procedure. The scrub is ongoing and continues while the account is open with CMLP at all times (if the bankruptcy status of a consumer changes, CMLP is automatically notified by scrub service and ceases collections). CMLP similarly trains its Client Services and Account Resolution employees to immediately shut down any accounts that CMLP learns—through creditors, consumer disputes, and any other sources—may be subject to bankruptcy. Similarly, if a consumer, creditor (like Walgreens here), or bankruptcy court notifies CMLP that an account is subject to bankruptcy, CMLP ceases all collection activity as a matter of policy. In this case, there was simply no notification of bankruptcy from any source to CMLP.

Given her lack of standing and the comprehensive, multi-pronged, automatic, and reasonable procedures CMLP engages in to prevent collecting on discharged accounts, no issues of material fact exist under which a reasonable factfinder could find in Plaintiff's favor in this case. This Court should thus grant CMLP's Motion for Summary Judgment.

## SUMMARY JUDGMENT STANDARD OF REVIEW

A party is entitled to summary judgment if it shows that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court views the record in a light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. "The inquiry to be made on a motion for summary judgment is whether the evidence

presents a sufficient disagreement to require submission to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law." *Bruns v. Nw. Steel & Wire Co.*, 869 F. Supp. 583, 588 (N.D. Ill. 1994).

## ARGUMENT

**A.     Plaintiff Lacks Article III Standing Because She Suffered No Injury In Fact**

Plaintiff lacks standing to maintain this cause of action in this Court. "Under Article III, § 2, of the Constitution, the federal courts have jurisdiction over this dispute . . . only if it is a 'case' or 'controversy.'" *Raines v. Byrd*, 521 U.S. 811, 818 (1997). "This is a bedrock requirement." *Id*. Indeed, the Supreme Court has repeatedly reaffirmed its importance, stating "no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (internal citations and alterations omitted).

Arising from the "case or controversy" requirement, a litigant must have standing to maintain a suit in federal court. "The doctrine limits the category of [federal] litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* at 1547. To meet this "irreducible constitutional minimum . . . [t]he plaintiff must have [] suffered an injury in fact." *Id.* Injury in fact is the "first and foremost of standing's three elements." *Id.* Indeed, even "Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Raines*, 521 U.S. at 820 n.3. A plaintiff still must show she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial ruling." *Larkin v. Fin. Sys. of Green Bay*, 982 F.3d 1060, 1064 (7th Cir. 2020) (*Spokeo*, 136 S. Ct. at 1547).

"Congress' role in identifying and elevating intangible harms does not mean that a plaintiff

automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Spokeo*, 136 S. Ct. at 1549. Even where Congress creates civil liability for some action, a litigant may not "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id*. at 1549. Instead, a plaintiff must show she "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Groshek v. Time Warner Cable, Inc*., 865 F.3d 884, 886 (7th Cir. 2017) (quoting *Spokeo*, 136 S.Ct. at 1548).

For an injury to be particularized it must "affect the plaintiff in a personal and individual way." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992). The plaintiff herself must have "personally suffered an actual injury or an imminent threat of injury," rather than just a "generalized grievance shared by all members of the public." *Larkin*, 982 F.3d at 1064. A statutory violation must harm the plaintiff or present an "appreciable risk of harm to the underlying concrete interest that Congress sought to protect." *Larkin*, 982 F.3d at 1066 (citing *Casillas v. Madison Avenue Associates, Inc.*, 926 F.3d 329, 333 (7th Cir. 2019)). Simply stating that collection letters were "false, deceptive, or misleading, or unfair and unconscionable, in violation of §§ 1692e and 1692f" is not an allegation of any actual or potential harm. *Id.* And when "the injured party's own testimony is the only proof of emotional damages, [s]he must explain the circumstances of h[er] injury in reasonable detail; [s]he cannot rely on mere conclusory statements." *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 971 (7th Cir. 2004).

This Court has ruled that the plaintiff's own testimony, without other evidence, of stress, anxiety, and embarrassment are not enough to infer that the Plaintiff suffered an injury that would establish standing. *See Crabtree v. Experian Info. Sols., Inc.*, 948 F.3d 872 (7th Cir. 2020).

5

Moreover, "the state of confusion" is "not itself an injury." *Brunett v. Convergent Outsourcing, Inc.*, 982 F.3d 1067, 1068 (7th Cir. 2020) (citing *Trichell v. Midland Credit Management, Inc.*, 964 F.3d 990 (11th Cir. 2020)). Retaining counsel because of confusion is also not sufficient to constitute an injury, because even "innocuous statements about tax law may lead people to consult counsel." *Brunett*, 982 F.3d at 1069. "A debtor confused by a dunning letter may be injured if she acts, to her detriment, on that confusion—if for example, the confusion leads her to pay something she does not owe. . .," however, if the debtor cannot show that the letter led her to "change her course of action or put her in harm's way," then she has not been injured. *Pennell v. Global Trust Mgmt., LLC*, 990 F.3d 1041, 1045 (7th Cir. 2021).

Here, Plaintiff's injury allegations fail twice over, in that (1) she fails to adequately prove an injury in fact, and (2) she fails to prove her alleged injury is fairly traceable to CMLP's actions. Regarding the substance of her injuries, Plaintiff complains that she was "forced to retain counsel" and that CMLP caused her "anxiety and emotional distress." DSMF 37.[1] At the outset, Plaintiff testified that she did not, in fact, "retain counsel" for the purpose of responding to CMLP's letter, but handed the letter over to counsel she had already retained for other matters. DSMF 46 (noting the two others matters in which she was already represented by her current counsel at the time she received the Letter). Additionally, and perhaps more importantly, as the 7th Circuit found in *Brunett*, merely feeling compelled to obtain counsel does not rise to the level of injury-in-fact. 982 F.3d at 1069.

Thus, her injury-in-fact claim relies upon her allegations of "anxiety and emotional distress," which must either be proved by evidence aside from her own testimony or by testimony

---

[1] CMLP will cite to Defendant's Statement of Material Facts as follows: "DSMF ___" (indicating the numbered paragraph in which the fact and citation may be found).

that explains the circumstances in reasonable detail. *See Sarver*, 390 F.3d at 971. Her deposition testimony, though, fell far short of describing a significant, particularized, concrete injury. Plaintiff admitted at deposition that she knew the debt described in the letter was discharged, thus removing any possible source of worry that she would be required to pay the debt. DSMF 38. That understanding, and subsequent lack of anxiety around a debt she knew she would not be required to pay, helps explain why she admits she barely reacted at all to the Letter. The only person, other than the parties and attorneys in this case, with whom she even discussed the letter was her husband. DSMF 45. Yet, when asked what her husband would testify to should he be called as a witness, she anticipated he would merely mention his knowledge of a debt collection, that the debt was discharged, that the letter was given to their attorneys, and that she was being deposed. DSMF 46. She made no mention of her anxiety or emotional distress in his expected testimony. Plaintiff made no mention of thinking that she owed the debt or would be required to pay the debt. Asked multiple times to describe her anxiety or emotional distress in more detail, Plaintiff repeatedly merely made conclusory statements that she was "anxious" and that the letter caused "stress." DSMF 37. When asked whether she was seeing the psychiatrist as a result of receiving the Letter, she responded that her anxiety was about her bankruptcy "as a whole, not this – I didn't get this letter and brought it to my psychiatrist and only talked about this letter." DSMF 43-44. When pressed, she admitted she had never even mentioned the Letter to her psychiatrist. DSMF 45. When questioned further about seeing a psychiatrist, Plaintiff stated that she began seeing her psychiatrist in the "realm of time" of May of 2020, which was at least two months prior to her receiving Defendant's letter in July. DSMF 41-42. She had also previously seen a psychiatrist in the year prior to these events for postpartum depression—before even filing for bankruptcy. DSMF 40.

Her own description of her mental health treatment and lack of any tangible reaction to receiving the Letter, then, reveals both problems—the particularity and the fair traceability—with her injury claim. Plaintiff all but admits outright that receiving the letter had absolutely no effect on her at all—she knew the debt had been discharged, so she left it in the capable hands of her attorneys to manage. DSMF 39. Plaintiff had sought mental health treatment for other forms of emotional distress in the past, yet never mentioned this letter to her psychiatrist. Time and again in her testimony, she uses the words "stress" and "anxiety," but when asked how those feeling have affected her (such as whether she had even mentioned the Letter to her psychiatrist), she fails to describe anything particular. DSMF 38. And, like with the retention of a lawyer, her testimony has more than established that the reason she sought treatment—the source of her alleged anxiety and stress—simply was not this Letter. DSMF 40-45. She happened to receive the Letter during a time period when she was already seeing a psychiatrist for anxiety, and the Letter's arrival did not even rise to a level of importance that it merited a single mention to her psychiatrist. Her testimony, in short, fails to establish a particularized, concrete injury that is fairly traceable to the alleged conduct of CMLP.

Finally, while her claim does not specifically evoke "confusion," but rather "anxiety" and "emotional distress," it is notable that, like the cases cited above discuss, her alleged anxiety and distress did not lead her to change her course of action in any way (such as considering paying the debt). *See Pennell*, 990 F.3d at 1045. When asked if she did anything in response to receiving the Letter, Plaintiff stated merely that she gave it to her attorneys. DSMF 48. She spoke to nobody

about it except her husband, and did not take any other action other than handing it to previously-retained attorneys. DSMF 45-48.²

In sum, Plaintiff attempts to evoke federal jurisdiction based upon injury allegations that are vague and nonspecific and in contradiction to her own testimony that she knew the debt was discharged and uncollectable at the time she read the letter. And, by her own admission, the "anxiety" and "emotional distress" she claims to have suffered were preexisting, related to other factors, and are not fairly traceable to the alleged conduct of CMLP. And she took no action as a result of her alleged emotional distress, other than to hand the Letter over to her lawyers. She has failed to allege and injury-in-fact, and thus lacks standing under Article III.

**B.     The Bona Fide Error Defense Protects CMLP From Liability**

CMLP cannot be held liable for the alleged violations of the FDCPA because it is protected by the bona fide error defense. "A debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of the evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c). The bona fide error defense is a "complete defense." *Ross v. RJM Acquisitions Funding LLC*, 480 F.3d 493, 495 (7th Cir. 2007). "The procedures employed by the debt collector need only be reasonable; they need not be the most advanced available." *Bianchi v. The Bureaus, Inc.*, No. 05 C 5769, 2008 WL 597587, at *3 (N.D. Ill. Feb. 27, 2008). "[T]he FDCPA does not require debt collectors to take

---

² Indeed, it is notable that, upon giving the letter to her attorneys, the next action taken was the filing of the lawsuit, as the lawsuit was filed before the 30-day validation/dispute period had expired. *See* DSMF 31 (Letter sent July 1, 2020); DSMF 33 (lawsuit filed July 21, 2020, less than 30 days after the date reflected on the Letter). Had she or her attorneys contacted CMLP about the bankruptcy, according to CMLP's procedures, this matter would have been resolved and all collection activity would have ceased. *See* Exhibits DSMF 18-20 (describing procedure of shutting down accounts where consumers dispute the debt based on bankruptcies).

9

every conceivable precaution to avoid errors, but only requires reasonable procedures." *Cross v. Risk. Mgmt. Alternatives, Inc.*, 374 F. Supp. 2d 649, 652 (N.D. Ill. 2005) (citing *Kort v. Diversified Collection Services*, 394 F.3d 530, 539 (7th Cir. 2005); *Hyman v. Tate*, 362 F.3d 965, 968 (7th Cir. 2004)). A reasonable procedure is one that is reasonably adapted to avoid clerical or factual errors through processes that have mechanical or other such regular orderly steps. *Leeb v. Nationwide Credit Corp.*, 806 F.3d 895, 899 (7th Cir. 2015) (internal citations omitted). At a minimum, such processes or mechanical steps should inform employees what actions they should take in certain circumstances, rather than just represent a "thinly specified 'policy,' allegedly barring some action but saying nothing about what action to take[.]" *Id*. at 900.

As explained in more detail below, CMLP engages in a multi-pronged procedure to identify accounts subject to bankruptcy in order to automatically cease collection activities, including subjecting every account to a bankruptcy "scrub" procedure, and training employees to mark accounts as subject to bankruptcy whenever CMLP receives bankruptcy information from creditors, consumers, scrub services, and other sources. Courts in this Circuit have deemed procedures "reasonable" that fall well short of those maintained by CMLP.

In *Cross v. Risk. Mgmt. Alternatives, Inc.*, for example, this Court found a debt collector's procedure adequate where it subjected *some* accounts to bankruptcy scrubs. 374 F. Supp. 2d 649, 652 (N.D. Ill. 2005). There, the debt collector's policy was to check new accounts for bankruptcies only "on those types of accounts which experience had taught it were most likely to be the subject of bankruptcy petitions." *Id*. at 652. Those types of accounts included "high balances, sub-prime loans, and debts of consumers whom its creditor customers think might file for bankruptcy[.]" *Id*. at 651. This Court found the collector's procedures there met the "reasonableness test" of the bona fide error defense, and that "a debt collector who had reasonable policies and procedures in place

to avoid sending dunning letters to debtors in bankruptcy was not required by the statute . . . to independently search bankruptcy records to assure that [accounts] forwarded for collection were not in bankruptcy." *Id*. at 652.

The 7th Circuit similarly upheld a debt collector's procedures in *Ross v. RJM Acquisitions Funding LLC*, 480 F.3d 493, 497 (7th Cir. 2007). There, the Court explained, the debt collector's procedures included an understanding that its creditor clients would inform it of any applicable bankruptcies, a bankruptcy search conducted through a third-party firm, a promise from the creditor that it would notify the collector if it received any discharge notices on its accounts, and the collector's "prompt cessation of any attempt to collect a debt upon notification that it had been discharged." *Ross*, 480 F.3d at 497. Weighing the costs of improving the procedure against the minor and infrequent harms caused by occasional clerical errors, the court ruled the bona fide error defense protected the collector from liability. *Id*.

CMLP's procedures go above and beyond the procedures approved in those cases. It is CMLP's policy not to engage in any collection activities on accounts it knows to be subject to bankruptcy. DSMF 6. To protect against collecting on such accounts, CMLP has multiple policies and procedures in place. First, CMLP's policy is not to accept any accounts from creditors where the creditor knows the account is subject to bankruptcy. DSMF 7. CMLP expects its creditors to inform it of any bankruptcy information. DSMF 8. Then, every time CMLP receives a new account, it subjects that account to a bankruptcy scrub procedure. DSMF 9. Under this procedure, new accounts are sent to a third-party vendor, LCI, which compares the new placements with information from their databases to look for bankruptcy filings and identify accounts subject to bankruptcy. DSMF 8-11. In addition to this initial "scrub," LCI then continues to monitor accounts and to update CMLP if any new bankruptcy information is found that applies to any of

11

CMLP's current accounts. DSMF 12-13. Whenever a bankruptcy is identified that may apply to any account CMLP holds, CMLP automatically marks those accounts and automatically ceases all collection activity. DSMF 16-20.

In addition to the bankruptcy scrub procedure—which is applied to every account CMLP receives—CMLP has policies and procedures in place to act upon bankruptcy information received from other sources. CMLP expects creditors to inform it if they are or become aware of a bankruptcy that applies to any of their accounts. DSMF 8. Such information from creditors is either automatically received, or comes in through creditors' contact with a Client Services representative. DSMF 8. Where the information is received through an automated process, CMLP's system automatically updates the account with the bankruptcy information and shuts it down. DSMF 16. Where a creditor communicates with a Client Services representative, that representative is trained to follow a procedure to manually mark the account for bankruptcy, which also shuts down all collection efforts on the account. DSMF 16. The marking of an account for bankruptcy status, whether automatic or manual, automatically prohibits any and all collection activity from that moment forward. DSMF 19-20.

Finally, CMLP receives bankruptcy information from the consumers themselves in the form of disputes. When they receive disputes, the procedure is the same as when the Client Services department receives bankruptcy information from a creditor. When a dispute is received, the Account Resolution Department employees are trained to timely process those disputes, because "collection efforts must be stopped immediately." DSMF 18. Similar to the above procedure, the Account Resolution team will immediately review a bankruptcy dispute, and is trained, as a matter of policy, to mark any such accounts with a bankruptcy code so that collection efforts will cease on the account. Exhibit 18-20. Similarly, if a dispute is received from a

12

consumer's attorney, CMLP's policy is to mark that account for bankruptcy status and shut down all collection efforts. DSMF 19.

Through this multi-tiered approach, CMLP ensures that no collection occurs on any new account subject to bankruptcy (through its initial scrub). It then ensures that no reported bankruptcy information—whether from creditors, consumers, or consumers' attorneys—goes unnoticed (through the manual bankruptcy flagging procedures). And it ensures that any new bankruptcy information, whether reported to CMLP or not, is found and acted upon (through its vendor's continuous monitoring process). These processes are memorialized and available to all employees, and are all included in the regular training provided by the company, including in regular quarterly refresher courses for any employee handling such accounts. DSMF 21.

The policies and procedures CMLP has in place are reasonable measures designed to prevent CMLP from violating the FDCPA. Just as the 7th Circuit has commanded, CMLP's procedures include processes that have mechanical and orderly steps meant to avoid mistakes. *See Leeb*, 889 F.3d at 899. The policies and procedures inform employees what to do under various circumstances (rather than just state a nonspecific policy against collecting on discharged accounts). *See id.* at 900. CMLP's policies and procedures are more comprehensive than procedures that have been deemed reasonable by this Court and the 7th Circuit in *Cross* and *Ross*. And the procedures are memorialized and included in employees' training on a regular basis.

Those procedures were followed in this case. DSMF 27. As the Account Notes reflect, the Account was first placed with CMLP on June 29, 2020. DSMF 23. CMLP sent the Account information to LCI for a bankruptcy scrub. DSMF 28. And CMLP received a response from LCI—with no bankruptcy information found—before it sent its initial communication to Plaintiff. DSMF 29-32. CMLP did not receive bankruptcy information from LCI, nor did it receive such

13

information from the bankruptcy court, Walgreens, Plaintiff, or her attorney. DSMF 24-26; 29-30; 34. Instead, rather than inform CMLP of the bankruptcy, which would have caused all collection activities to cease automatically, Plaintiff filed this suit on July 21, 2020. DSMF 33-35. Upon learning of the suit, CMLP closed the account and marked it as a bankruptcy on July 22, 2020. DSMF 36. At the time it sent the collection letter, despite having gone through the reasonable scrub procedure when it received the account, CMLP was not aware of Plaintiff's bankruptcy. DSMF 35. As soon as CMLP became aware of the bankruptcy (through the filing of this lawsuit), it shut down the account. DSMF 36.

Under the applicable law, CMLP's procedures undoubtedly qualify as "reasonable," and evoke the total protection of the bona fide error defense against any liability in this case. Despite those procedures, CMLP lacked knowledge of Plaintiff's bankruptcy. As soon as CMLP was informed of the bankruptcy, it ceased all collection efforts and shut down the account. No genuine issues of material fact are present as to CMLP's lack of knowledge and the reasonableness of its procedures. As a matter of law, CMLP is entitled to the protection of the bona fide error defense.

## CONCLUSION

Based on the evidence, no reasonable factfinder could find in Plaintiff's favor. The undisputable facts demonstrate she did not suffer an injury-in-fact, and that the bona fide error defense provides CMLP complete protection from liability. CMLP is entitled to summary judgment.

WHEREFORE, Defendant Credit Management, LP, respectfully requests this Court enter judgment granting Defendant's Motion for Summary Judgment, award its fees and costs incurred herein, and dismiss all Plaintiff's claims with prejudice.

Dated: May 7, 2021               Respectfully Submitted,

**MALONE FROST MARTIN PLLC**
*Attorneys for Defendant*

/s/ PATRICK A. WATTS
PATRICK A. WATTS, IL Bar #6302112
150 S. Wacker Dr., Ste. 2400
Chicago, IL 60606
P: (312) 741-0990
F: (888) 632-6937
pwatts@mamlaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 7, 2021, the foregoing was filed electronically with the Clerk of the Court and served by operation of the Court's electronic filing system to the following counsel of record:

Mohammed O. Badwan
Joseph S. Davidson
Victor T. Metroff
SULAIMAN LAW GROUP, LTD.
2500 South Highland Avenue, Suite 200
Lombard, Illinois 60148
mbadwan@sulaimanlaw.com
jdavidson@sulaimanlaw.com
vmetroff@sulaimanlaw.com

/s/ PATRICK A. WATTS